## APPEAL OF 719 FIFTH AVENUE CO.

Docket No. 6031. Decided November 20, 1926.

The opinions of witnesses as to the value of a leasehold on March 1, 1913, considered and *held* to be not sufficiently well founded to prove value.

*Frank S. Bright, Esq.*, and *Walter J. Rosston, Esq.*, for the petitioner.

*M. N. Fisher, Esq.*, for the Commissioner.

Deficiencies of $3,830.25 for 1920, and $10,837.24 for 1921, income and profits taxes, arising from disallowance by the Commissioner of a deduction of exhaustion of a leasehold, and of part of a deduction of exhaustion of a building erected on leased land.

### FINDINGS OF FACT.

The petitioner is a New York corporation organized in 1911.

On April 4, 1911, it entered into a lease agreement with Woodbury G. Langdon, whereby it became the lessee of the property lo-

cated at 719 Fifth Avenue, New York City. It agreed to erect on the land a twelve-story apartment and hotel building of such construction that it might be converted into an office building. The building was erected in accordance with the agreement at a cost of approximately $438,921.19, and was carried on petitioner's books of account at that figure. The building was completed in the latter part of 1912 and was opened in November or December of that year.

The building when completed had a 52 foot frontage on Fifth Avenue and a depth of 110 feet. There were three stores on the ground floor and 120 rooms above the first floor. These rooms were arranged in suites of two rooms and bath. The probable useful economic life of the building was $33\frac{1}{3}$ years.

The original term of the lease was 21 years from July 1, 1911, with options to renew for two additional terms of 21 years each, set out in detail below. The rent agreed upon was $45,000 a year from July 1, 1912, to July 1, 1921, and $50,000 a year for the balance of the original term. In addition, the petitioner agreed to pay all taxes, duties, assessments, water rates and payments of all kinds which might be imposed on the property. These amounted on or about March 1, 1913, to approximately $18,000 or $19,000 a year. The annual rent reserved for the first and second renewals of the lease, in the absence of agreement between the parties, was to be the equivalent of $4\frac{1}{2}$ per cent of value of the land at the beginning of the term, as determined in an impartial appraisal in a manner set forth in the lease. In no event, however, was it to be less than the rent reserved for the last preceding term.

The provisions of the lease, with regard to the options for renewal, are as follows:

AND it is mutually covenanted and agreed by and between the parties to these presents that if the said tenant, its successors or assigns, shall within the times above provided have erected and built, or caused to be erected and built, upon the premises hereby demised such building as is above described * * * so that such building well and satisfactorily * * * finished shall be standing on the said premises at the end and expiration of the said term and if the tenant, its successors or assigns, shall, during the whole of said term, well and faithfully keep all and every of the covenants and agreements herein contained on its part and behalf, then the landlord, his heirs or assigns shall and will, at the expiration of the term hereby demised, grant and execute unto the tenant, its successors or assigns, at its expense a new lease for the further term of twenty-one years, to commence from the expiration of the term hereby demised, at and for such annual rent, payable monthly in advance, as shall be ascertained as hereinafter mentioned, but not to be less than the yearly rental by these presents reserved. Such second lease to contain like covenants, provisions, conditions and agreements as are herein contained, except the covenant for the erection of any building on the said premises, and excepting this covenant for renewal, in lieu whereof such second lease shall contain a covenant on the part of the landlord that in case the

tenant shall during the whole of such second term well and faithfully keep all and every covenant, condition, provision and agreement in such second lease contained on its part and behalf, and that if the tenant, its successors or assigns, shall maintain such a building as is above described and in case of damage or destruction of the same by fire or other casualty shall rebuild and restore the same, so that such building well and satisfactorily repaired or rebuilt shall be standing on said premises at the expiration of said term contained in said second lease, then the landlord shall and will either pay to the tenant, its successors or assigns, the just and full value at that time of the building constructed in the manner hereinabove mentioned, which may be standing on said demised premises at the expiration of said second term, such value to be ascertained in the manner hereinafter provided, or shall and will at the end and expiration of the term contained in said second lease grant and execute unto the tenant, at its expense, a new lease for the further term of twenty-one years to commence from the expiration of the term granted by said second lease and for such annual rent payable monthly in advance as shall be ascertained as hereinafter mentioned, but not to be less than the yearly rent by said second lease reserved. Such third lease to contain like covenants, conditions, provisions and agreements as are in said second lease contained, except the foregoing covenant for renewal, in lieu whereof such third lease shall contain a covenant on the part of the tenant, its successors or assigns, that upon the termination of said third term, or upon any earlier termination of the term thereby granted, all buildings and improvements on said demised premises shall become the absolute property of the landlord.

AND it is further mutually covenanted and agreed by and between the parties thereto that at the expiration of the term of the first renewal hereof, if the same shall be given as herein provided, the landlord, his heirs, or assigns, shall have the full liberty and choice either to grant at the expense of the tenant a renewal of the lease then to be terminated for the further term of twenty-one years thence ensuing at a yearly rental, payable monthly in advance, to be ascertained in the manner hereinafter mentioned, but not to be less than the yearly rent reserved for and during the term then about to expire, or, on giving sixty days notice of his election to purchase said building, to pay unto the tenant, its successors, or assigns, the value of any building which shall have been so erected and built on said lots, constructed in the manner hereinabove provided, which may be then standing thereon, which value shall be ascertained as hereinafter stated.

AND it is expressly agreed that the landlord, his heirs or assigns shall be under no obligation hereunder to pay to the tenant, its successors or assigns, any sum for the building to be erected on said demised premises except as above specifically provided and that in case, by reason of default on the part of the tenant, its successors or assigns, in the performance of any of the covenants or conditions contained in this lease or in any renewal thereof, such lease shall be terminated, then and from thenceforth, such buildings as shall then be standing upon the demised premises, shall become the absolute property of the landlord, his heirs or assigns.

### OPINION.

STERNHAGEN: In attempting to prove that on March 1, 1913, it owned a leasehold which had a net value of $300,000 over and above its obligations, the petitioner has offered the opinions of three witnesses. These opinions, considered in the light of the experience

and reasoning upon which they are founded, may not safely be relied upon as establishing the price which a willing purchaser able to buy would pay for the leasehold in addition to the cost of the building and the current obligations fixed by the lease. Two of the witnesses had little or no qualifications to give weight to their opinions. The opinion of one was expressed in response to a hypothetical question which was not in accordance with the facts. It assumed that the building had been constructed and fully occupied for a year, whereas it was actually completed less than three months and there is no evidence whatever that it was occupied at all. Many of the facts were entirely omitted from the hypothesis. The other, who was the petitioner's president, supported his valuation by general statements in reference to the history and experience of hotel buildings in the neighborhood, leaving it entirely uncertain how much of such experience was known on March 1, 1913. It was clear that some of the circumstances which he considered had occurred between March 1, 1913, and the time of hearing. The third witness arrived at a valuation by an empirical process. He took an assumed cost of the building at 60 cents per cubic foot, to which he added assumed annual costs such as taxes (assumed to remain constant) and maintenance and the fixed rental stated in the lease. These he compared with an assumed future income from the building based upon continued occupancy and rentals from the stores and 90 per cent occupancy at assumed rentals from the hotel apartments. The net income thus arrived at was reduced to a present value as of the beginning of the period. His assumptions, however, are not sufficiently established to warrant their acceptance. The record shows that a small apartment hotel in this vicinity was practically a new venture in 1913, the success of which was so doubtful that the lessor prescribed that the building to be erected should be readily convertible into an office building. Hotels in this vicinity were not an assured success and several of them were abandoned and the buildings either torn down or reconstructed for other purposes.

The testimony of the witnesses as to the uncertainties of the future is difficult to reconcile with their testimony as to the reliability of mathematical prognostications made as of March 1, 1913. For the purpose of proving that the building and the leasehold should be depreciated upon the basis of a short life, the testimony of the witnesses is to the effect that the uncertainties of the future require the 5 per cent depreciation rate claimed. The same witnesses, however, expressed with assurance their opinion that on March 1, 1913, they would have been reasonably certain that conditions of the then future would have been so reliable as to justify an appraisal of the leasehold with no discount factor except the

10 per cent vacancy of the hotel space. This is not consistent and does not justify the finding of fact of value sought by the petitioner. Furthermore, it precludes a finding of any value. Since it is entirely a constructive value and the method of its construction fails, there is nothing left upon which the Board can find value in any other amount. It is therefore held that the petitioner has proven no value on March 1, 1913, of the leasehold and is entitled to no deduction for its exhaustion during the years in question.

It is sufficiently clear from the evidence that on March 1, 1913, and ever since, rapid changes were and have been taking place in the vicinity of the property in question. The question then is whether in 1920 and 1921 the building which had cost $438,921.19 in 1912 could reasonably be expected to represent capital value to this taxpayer beyond the expiration of the initial term of the lease in 1931. We are of opinion that 3 per cent is a reasonable allowance to take care of the preservation of the petitioner's capital investment unimpaired. In other words, giving consideration to the conditions of the neighborhood and the probabilities of the future as indicated by the facts of the past, we are of opinion that the allowance for exhaustion, wear and tear and obsolescence may reasonably be based upon a probable life of 33⅓ years from the date of construction of the building.

It can not be said that merely because the lessee has reserved the legal right to quit the premises at the end of 21 years this fact measures the reasonable allowance for exhaustion of the building. The word "reasonable" in the statute implies an appraisal of the probabilities. An examination of the lease in its entirety indicates that the parties contemplated that the lessee would continue to occupy the premises and that provision should be made for an alteration from time to time of the rental. Since some estimate must be made, we are of opinion that it is more probable that the lessee will continue to occupy the building than that it will abandon the entire project at the end of the initial term under the conditions prescribed in the lease. That it can not be said as a matter of law that the mere term of the lease establishes the measure of the exhaustion allowance, could be illustrated by assuming a lease of an initial term of three years with a renewal for a much longer period. Such a lease would clearly not justify the lessee in writing off the building in the first three years.

It thus becomes necessary in the light of the evidence to determine only what is a reasonable allowance for exhaustion, wear and tear and obsolescence of the building itself, and as to this it is our judgment that this deduction should be based upon an assumed life of 33⅓ years, thus giving a 3 per cent annual deduction.

The deficiency should be redetermined by excluding any deduction for the exhaustion of the leasehold and by including a deduction for the exhaustion and obsolescence of the building measured by 3 per cent on its cost to the petitioner.

*Judgment will be entered in accordance with the foregoing opinion on 15 days' notice, under Rule 50.*